# NO. 22-1844

In The

# United States Court Of Appeals
## For The Fourth Circuit

**JULIETTE GRIMMETT; RALSTON LAPP GUINN MEDIA GROUP; JOSH STEIN FOR ATTORNEY GENERAL CAMPAIGN; JOSH STEIN; SETH DEARMIN; ERIC STERN,**

*Plaintiffs – Appellants,*

**v.**

**N. LORRIN FREEMAN, in her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina,**

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

———————

*AMICUS* BRIEF OF DUKE FIRST AMENDMENT CLINIC
IN SUPPORT OF APPELLANTS SEEKING REVERSAL OF THE RULING BELOW

———————

**Sarah Ludington, N.C. State Bar No. 19997**
**C. Amanda Martin, N.C. State Bar No. 21186**
**DUKE FIRST AMENDMENT CLINIC**
**210 Science Drive**
**Durham, NC 27708**
**Tel: (919) 613-7048**
**Fax: (919) 613-7262**
**ludington@law.duke.edu**
**amartin@law.duke.edu**

*Counsel for Amicus Curiae*

**Christopher A. Brook, N.C. Bar No. 33838**
**PATTERSON HARKAVY LLP**
**100 Europa Drive, Suite 420**
**Chapel Hill, NC 27517**
**Tel: (919) 942-5200**
**Fax: (866) 397-8671**
**cbrook@pathlaw.com**

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __22-1844__    Caption: _Juliette Grimmett v. N. Freeman_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Duke First Amendment Clinic_
(name of party/amicus)


who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?                          ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                ☐YES ☑NO
     If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s Sarah Ludington                          Date:   September 27, 2022

Counsel for:  Duke First Amendment Clinic

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .................................................................... ii

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION .................................................................................. 1

ARGUMENT ......................................................................................... 2

    I.    The history of criminal libel law is inseparable from the history of governmental suppression of political speech ........ 2

        A.    The English common law before the founding .............. 2

        B.    The colonial era ................................................................. 5

        C.    The founding era ............................................................... 7

        D.    The nineteenth century to the present ........................ 10

    II.    Criminal libel actions in North Carolina have historically been used for the suppression of speech critical of public officials ........................................................ 14

        A.    Common law criminal defamation prosecutions were historically brought for criticism of public officials .......................................................................... 14

        B.    Section 163-274(a)(9) was enacted to quell unpopular political speech .......................................... 15

        C.    Section 163-274(a)(9) has fallen into desuetude ........ 20

        D.    Civil defamation suits provide the proper remedy for libel .......................................................................... 21

CONCLUSION .................................................................................... 24

CERTIFICATE OF COMPLIANCE ...................................................... 25

## TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Aycock v. Padgett,*
    516 S.E.2d 907 (N.C. Ct. App. 1999) .............................................. 22

*Boyce & Isley, PLLC v. Cooper,*
    710 S.E.2d 309 (N.C. Ct. App. 2011) .............................................. 22

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................ 2

*Craven v. Cope,*
    656 S.E.2d 729 (N.C. Ct. App. 2008) .............................................. 22

*Garrison v. Louisiana,*
    379 U.S. 64 (1964) ............................................................................ 13

*Grant v. Miller,*
    611 S.E.2d 477 (N.C. Ct. App. 2005) .............................................. 22

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988) ..................................................................... 22, 23

*Lewis v. Rapp,*
    725 S.E.2d 597 (N.C. Ct. App. 2012) .............................................. 22

*Manley v. Greensboro News Co.,*
    85 S.E.2d 672 (N.C. 1955) .......................................................... 21-22

*People v. Croswell,*
    3 Johns. Cas. 337 (N.Y. 1804) ........................................................ 11

*Respublica v. Oswald,*
    1 Dall. 319 (Pa. 1788) ..................................................................... 10

*Snyder v. Phelps,*
    562 U.S. 443 (2011) .......................................................................... 23

*State v. Greenville Pub. Co.*,
    102 S.E. 318 (N.C. 1920) ............................................................... 15

*State v. Pritchard*,
    41 S.E.2d 287 (N.C. 1947) ............................................................. 21

*State v. Townsend*,
    86 N.C. 676 (N.C. 1882) ............................................................... 15

*Street v. New York*,
    394 U.S. 576 (1969) .................................................................22-23

*Taylor v. Greensboro News Co.*,
    291 S.E.2d 852 (N.C. Ct. App. 1982) ............................................. 22

*Williams v. Rhodes*,
    393 U.S. 23 (1968) .......................................................................... 2

**Statutes:**

N.C. Gen Stat. § 14-47 ...................................................................... 15

N.C. Gen. Stat. § 53C-8-10 ................................................................ 15

N.C. Gen. Stat. § 163-196(11) ........................................................... 21

N.C. Gen. Stat. § 163-274(a)(9) ................................................. *passim*

**Constitutional Provisions:**

U.S. Const. amend. I ................................................................ *passim*

U.S. Const. amend. XIV ...................................................................... 18

**Other Authorities:**

Anthony Lewis, Address: *Civil Liberties in a Time of Terror*,
    2003 Wis L. Rev. 257 ..................................................................... 8

C.S. 4185(12) (1919) ........................................................................ 17

Catherine J. Ross, *Ministry of Truth: Why Law Can't Stop
Prevarications, Bullshit, and Straight-Out Lies in Political Campaigns,*
  16 First Amend. L. Rev. 367 (2017) ................................................... 16

*Constitutionality of the Law of Criminal Libel,*
  52 Colum L. Rev. 521 (1952) ............................................... 13

David A. Elder, *Kentucky Criminal Libel and
Public Officials – An Historical Anachronism?,*
  8 N. Ky. L. Rev. 37 (1981) ............................................. 5, 13

David M. Rabbin, *The Emergence of
Modern First Amendment Doctrine,*
   50 U. Chi. L. Rev. 1207 (1983) ........................................... 7

David S. Ardia & Evan Ringel, *First Amendment Limits on
State Laws Targeting Election Misinformation,*
  20 First Amend. L. Rev. 291 (2022) ................................................... 20

*De Libellis Famosis,*
  77 Eng. Rep. 250, 5 Coke 125 (1605) ................................................... 3

*De Scandalis Magnatum*
  3 Edw. I c. 34 (Eng. 1275)...............................................2-3

Donna J. Spindel, *The Law of Words:
Verbal Abuse in North Carolina to 1730,*
  39 Am. J. of Legal Hist. 25 (1995)................................................. 14, 15

*Ewing Corrupt Practices Act Would Prevent
Hoovercrat Expense Account Farce,*
  News & Observer Feb. 26, 1931............................................ 19

Gregory C. Lisby, *No Place in the Law: The Ignominy of
Criminal Libel in American Jurisprudence,*
  9 Comm. L. & Pol'y 433 (2004)................................................. 13, 14

Jay Wagner & Anthony L. Fargo, *Criminal Libel in the Land of the
First Amendment: Special Report for the International Press Institute,*
  (Int'l Press Inst., rev. and reissued 2015)....................................6, 8-9

iv

John Kelly, *Criminal Libel and Free Speech*,
6 U. Kan. L. Rev. 295 (1958) ........................................................ *passim*

Joseph Russomanno, *The Right and the Duty: Jefferson,*
*Sedition and the Birth of the First Amendment's Central Meaning*,
23 Comm. L. & Pol'y 49 (2018) ............................................................ 9

Josephus Daniels, *Editor in Politics*,
*Vol. 2* (1941) ...................................................................................... 16

Josephus Daniels, *Must Stop Corruption*,
News & Observer Jan. 26, 1913 ......................................................... 16

Leonard Levy, *Legacy of Suppression*
(1963) ..................................................................................................... 6

Leonard Levy, *On the Origins of the Free Speech Clause*,
32 UCLA L. Rev. 177 (1984) ................................................................ 7

Leonard Levy, *The Emergence of a Free Press*
(1965) ..................................................................................................... 7

Matthew L. Schafer, *In Defense: New York Times v. Sullivan*,
82 La. L. Rev. 81 (2021) ........................................................................ 7

Michael Kent Curtis, *The Fraying Fabric of Freedom: Crisis and*
*Criminal Law in Struggles for Democracy and Free Expression*,
44 Tex. Tech. L. Rev. 89 (2012) ...................................................... 9, 12

Norman L. Rosenberg, *The Law of Political Libel and Freedom of the*
*Press in Nineteenth Century America: An Interpretation*,
17 Am. J. Legal Hist. 336 (1973) .............................................. 10, 11, 12

Richard L. Watson, *A Political Leader Bolts:*
*F. M. Simmons in the Presidential Election of 1928*,
37 N.C. Hist. Rev. 516 (1960) ................................................. 17, 18, 19

Rob Christensen, *The Paradox of Tar Heel Politics*
(2010)................................................................................... 16

Russell Hickey, *A Compendium of U.S. Criminal*
*Libel Prosecutions: 1990-2002*,
Libel Def. Res. Bull., Mar. 27, 2002.................................... 14

## INTEREST OF AMICUS CURIAE

The Duke First Amendment Clinic engages in research, scholarship, and *pro bono* legal representation in matters that implicate the First Amendment.  Amicus has authored numerous briefs concerning the intersection of criminal statutes and free speech and draws on a wealth of expertise and knowledge relating to matters relevant to this case.

Amicus writes in response to the threatened application of a North Carolina criminal libel statute, N.C. Gen. Stat. § 163-274(a)(9) (2021), to an elected official, Attorney General Josh Stein. The history of criminal libel statutes in general—and of the North Carolina statute in particular—lends support to the argument that the statute violates the First Amendment and should be ruled unconstitutional.

Counsel for amicus authored this brief in its entirety and received no money from any source to fund preparation of this brief.

## INTRODUCTION

The Supreme Court has long recognized that robust discussion and debate about the qualifications of candidates is a form of political expression integral to our electoral systems and thus to the democratic form of government established by our Constitution. As such, electioneering and other forms of political speech are entitled to the

1

highest protections afforded by the First Amendment. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 40 (1976); *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). Yet from its birth in the notorious Star Chamber of the Tudor kings, criminal libel law was conceived of and used as a tool to stifle political discussion and dissent. The history of criminal libel prosecutions in America attests to the danger of empowering government officials to use criminal sanctions against political rivals.

Politically motivated libel prosecutions are not unknown in North Carolina. The North Carolina statute at issue in this case, N.C. Gen. Stat. § 163-274(a)(9), was enacted under circumstances suggesting that it was designed to quell disfavored political speech. This statute, and indeed all criminal libel laws, are fundamentally at odds with the contemporary philosophy and doctrine of the First Amendment.

## ARGUMENT

## I.   The history of criminal libel law is inseparable from the history of governmental suppression of political speech

### A.   The English common law before the founding

The English common law crime of libel has its roots in the thirteenth century. Enacted in 1275, a criminal statue known as *De Scandalis Magnatum* prohibited "any False News or Tales whereby

Discord or Occasion of Discord or Slander may grow between the King and his People or the Great Men of the Realm." Violations were enforceable in the King's Council by indefinite detention of the purveyor until the "first author of the tale" was produced. While never used in the medieval period, this law helped set the agenda for the next six hundred years of criminal libel prosecutions against British subjects who criticized the King or his ministers.

The first known criminal libel case in English history, *De Libellis Famosis*, 77 Eng. Rep. 250, 5 Coke 125 (1605), was brought in the infamous Star Chamber for the publication of poems satirizing the deceased Archbishop of Canterbury. Leading the prosecution, the noted lawyer, judge, and Member of Parliament Sir Edward Coke laid out a rationale for criminal laws against libel that would continue to inform English and American jurisprudence into the nineteenth century. Lord Coke argued that criminal libel prosecutions were justified because of libel's tendency to cause a breach of the peace. He also argued that, as between a private individual and a public official, the libel of a public official was

> a greater offence [sic]; for it concerneth not only [sic] the breach of the peace, but also the scandal of government; for

what greater scandal of government can there be than to have corrupt or wicked Magistrates to be appointed and constituted by the King to govern his Subjects under him?

The logic of Lord Coke's rationale—that criminal libel prosecutions were necessary to maintain the validity of the government—meant that the truth or falsity of the defendant's statements was immaterial to any defense. What mattered instead was the tendency of the statement to denigrate the reputation of the King and his ministers. Indeed, the maxim "the greater the truth, the greater the libel" became "an accurate statement of a law designedly onerous to all opposition to the government." John Kelly, *Criminal Libel and Free Speech*, 6 U. Kan. L. Rev. 295, 302 (1958).

As common law courts assumed the Star Chamber's jurisdiction in the seventeenth century, they continued to tighten the screws against political dissidents. In seditious libel prosecutions, the question of the statement's libelous character was for the judge alone, based on the statement's "tendency" to create and diffuse an ill opinion of the government. Kelly, *supra*, at 302. By 1731, juries were allowed to decide only whether the libelous statement had been published and if the statement contained the "innuendo" ascribed to it in the indictment —

issues that were usually undisputed. David A. Elder, *Kentucky Criminal Libel and Public Officials – An Historical Anachronism?*, 8 N. Ky. L. Rev. 37, 45 (1981). Moreover, criminal libel law was mostly applied to public utterances regarding politics, religion, and other matters of public interest, since private insults could be handled with civil remedies. Criminal libel became "almost exclusively an instrument by which government was enabled to stifle criticism." Kelly, *supra*, at 305; *see also* Elder, *supra*, 43–46.

B.    <u>The colonial era</u>

The English common law rules of criminal libel carried over to the American colonies. As in the mother country, seditious libel was the most important branch of the crime due to the success of the civil action in rectifying private defamations. However, the colonists chafed at this harsh regime: "It is probable that no one thing contributed more to enflame the public mind against the common law than did the insistence of American courts on enforcing the harsh doctrines of the English law of criminal libel . . . ." Kelly, *supra*, at 306. Criminal libel was especially a threat to print publishers because the common law defined freedom of speech as the absence of prior censorship; publishers could be subsequently punished under the law of criminal libel. *Id.* at 305.

5

In 1733, a newspaper publisher named John Peter Zenger was prosecuted for publishing a series of articles critical of the royally appointed New York Governor William Crosby, a British noble. Alexander Hamilton, defending Zenger after his lawyers were disbarred for their insolence toward a judge sympathetic to the crown, conceded that his client had published the insulting tracts but argued that publication was not a crime because the statements therein were true. The jury agreed, and after a brief period of deliberation, Zenger was found not guilty on all charges.

Perhaps for the first time, truth had been successfully used as a defense to a criminal libel prosecution. While some historians insist that the trial was an "isolated phenomenon," others argue that the judgment "publicly stripped [seditious libel] of its efficacy" and "set a standard for free speech ideals in the United States." *Compare* Jay Wagner & Anthony L. Fargo, *Criminal Libel in the Land of the First Amendment: Special Report for the International Press Institute* 9 (Int'l Press Inst., rev. and reissued 2015), *with* Leonard Levy, *Legacy of Suppression* 19 (1963).

C.    The founding era

Historians fiercely disagree about how the founding generation understood the First Amendment when it was ratified in 1791. According to one leading scholar, "few [in the founding generation] . . . clearly understood what they meant by the free speech-and-press clause." Leonard Levy, *The Emergence of a Free Press* 266 (1965). On one view, the First Amendment did not displace any of the English common law, including its oppressive criminal libel doctrines. *See, e.g.*, Leonard Levy, *On the Origins of the Free Speech Clause*, 32 UCLA L. Rev. 177, 202 (1984). Others deny this assertion, insisting that the founding generation understood the First Amendment to require certain "liberal" constraints on criminal libel prosecutions such as those that would be adopted a year later by the British Parliament in Fox's Libel Act. *See, e.g.*, David M. Rabbin, *The Emergence of Modern First Amendment Doctrine*, 50 U. Chi. L. Rev. 1207 (1983); Matthew L. Schafer, *In Defense: New York Times v. Sullivan*, 82 La. L. Rev. 81 (2021). Still others argue that both the "common man and his legislators" believed that the First Amendment did away with censorship *and* seditious libel, although they concede that "judges of the young nation unanimously disagreed." Kelly, *supra*, at 310–11.

What is clear is that high government officials continued to use both common law criminal libel, as well as new criminal statutes modeled on the former, to persecute their political opponents. In 1798, President John Adams, a member of the Federalist party, signed into law the Alien and Sedition Acts, thereby prohibiting "scandalous and malicious writing or writings against the government of the United States." Unquestionably, the law was "a political statute designed to suppress supporters of [Democratic-Republican] Vice President Thomas Jefferson in his anticipated campaign against Adams in the presidential election of 1800." Anthony Lewis, Address: *Civil Liberties in a Time of Terror*, 2003 Wis L. Rev. 257, 264. The Acts, which actually included "liberal" constraints such as proof of intent, truth as a defense, and allowing juries to "determine the law and the fact," were widely regarded as declaratory of the then-existing common law. Kelly, *supra*, at 313.

Nevertheless, they were deeply unpopular. Jefferson and James Madison penned attacks on the Acts and persuaded the Kentucky and Virginia legislatures to pass them as resolutions. Jefferson went so far as to advocate for the abolition of criminal libel altogether. Wagner & Fargo,

8

*supra*, at 11. In 1801, the Federalists lost both the presidency and Congress, with the Acts "largely contributing to their downfall." Kelly, *supra*, at 315. President Jefferson pardoned all who had been convicted under the Acts, which expired—and were not reenacted—in 1801. *Id.* at 315–16.

The controversy over the Acts was "the genesis of an enhanced understanding and appreciation of the First Amendment, its central meaning and place in America." Joseph Russomanno, *The Right and the Duty: Jefferson, Sedition and the Birth of the First Amendment's Central Meaning*, 23 Comm. L. & Pol'y 49, 58 (2018). They were widely seen as an abuse not to be repeated. Michael Kent Curtis, *The Fraying Fabric of Freedom: Crisis and Criminal Law in Struggles for Democracy and Free Expression*, 44 Tex. Tech. L. Rev. 89, 99 (2012). In the nineteenth century, legislators enacting and judges upholding laws designed to control speech critical of the government, such as laws prohibiting the circulation of abolitionist literature, were careful not to use the terms "seditious libel." Kelly, *supra*, 316. This does not mean, however, that public officials ceased using common law criminal libel to stifle political criticism.

9

D.    <u>The nineteenth century to the present</u>

The common law crime of libel continued to be used as a tool of political censorship in the Early Republic. While federal indictments virtually disappeared after the lapse of the Sedition Act, Jeffersonians and Federalists frequently invoked state criminal libel to muffle political criticism. Norman L. Rosenberg, *The Law of Political Libel and Freedom of the Press in Nineteenth Century America: An Interpretation*, 17 Am. J. Legal Hist. 336, 338 (1973). In a series of Massachusetts cases, for example, an anti-Federalist newspaper editor was prosecuted for criticizing the administration. Kelly, *supra*, at 311. Another editor was indicted for referring to Massachusetts Supreme Court Chief Justice Francis Dana as a "tyrant judge." *Id.* Contempt of court actions for out-of-court utterances were also permitted, notwithstanding the public nature of the matters discussed. *Id.* In *Respublica v. Oswald*, 1 Dall. 319 (Pa. 1788), for example, a publisher was charged with contempt of court for printing an "address to the public" in his newspaper criticizing a libel action pending against him as politically motivated, certain Pennsylvania Supreme Court judges as biased, and the "doctrine of libels" itself as "incompatible with law and liberty." *Id.* at 320.

10

The persistence of politically motivated criminal libel actions prompted some legislatures to codify Hamilton's defense of truth. In *People v. Croswell*, 3 Johns. Cas. 337 (N.Y. 1804), another newspaper editor was prosecuted, this time for alleging that Jefferson had paid a man to write an article calling George Washington a traitor and Adams a "hoary-headed incendiary." Kelly, *supra*, at 312. On appeal, Alexander Hamilton argued that newspapers were entitled to publish the truth about "government, magistracy, and individuals" with "good motives and justifiable ends." *Id.* While the argument was not successful in court, it inspired the New York legislature to pass an act that embodied Hamilton's definition of liberty of the press. By 1830, most states had adopted this "truth plus" defense. *Id.* at 313.

Between 1824 and 1870, libel actions involving attacks on public officials—both civil and criminal—became exceedingly rare. This was due not to any notable change in the law, but rather to an acceptance of the idea of a party system and the emergence of popularly oriented, mass politics. Rosenberg, *supra*, at 341. A new generation of politicians recognized the virtues of organized political competition, making them less likely to equate the other party's criticisms with treason or sedition.

11

*Id.* In the "carnival-like" atmosphere of post-Jacksonian politics, where powerful party newspapers specialized in slinging mud at their opponents, it was hard to argue that the press had any real ability to damage the reputations of politicians. *Id.* at 343. Some, like the political theorist Frederick Grimke, even argued that unrestrained debate through the party press gave voice to "an immensely numerous class of the population who . . . now contribute essentially to the formation of what we term public opinion." *Id.* at 345.

Nevertheless, states continued to use the tools of common law criminal libel to crack down on politically controversial speech. In the 1850s, North Carolina passed a criminal statute using the "bad tendency" standard to prohibit any publication with a tendency to cause slaves or free blacks to revolt. Curtis, *supra*, at 105. The law was successfully used to prosecute a minister for distributing a Republican campaign pamphlet. *Id.*

Moreover, Lord Coke's historical "breach of peace" rationale, which justified prosecutions of libel against public figures, continued to explain key differences between the criminal and civil offenses to 1900 and beyond. For example, the criminal (but not the civil) action applied to

libels against the dead or large groups. And while truth was usually an absolute defense in a civil action, it was not always a complete defense in a criminal action. *See Constitutionality of the Law of Criminal Libel*, 52 Colum L. Rev. 521, 526 (1952). Most jurisdictions continued to append a "good intent" or similar requirement to the defense of truth well into the twentieth century. Elder, *supra*, 56; *see also Garrison v. Louisiana*, 379 U.S. 64, 70–71 n.7 (1964) (listing all jurisdictions having constitutional or statutory provisions as of 1964 making truth a defense "if published with good motives or justifiable ends, or some variant thereof").

Though rare in the twentieth century, criminal prosecutions for libel appear to have mainly involved statements criticizing public figures or officials. For instance, between 1946 and 1960, nearly all of the eleven criminal libel cases that appeared in American law reports involved defamation of officials, sometimes as candidates for reelection. Gregory C. Lisby, *No Place in the Law: The Ignominy of Criminal Libel in American Jurisprudence*, 9 Comm. L. & Pol'y 433, 467 & n.256 (2004). *Garrison*, 379 U.S. at 65–66, concerned the criminal prosecution for libel of a district attorney who criticized local judges at a press conference. According to one study, nearly 90 percent of the prosecutions or

threatened prosecutions between 1990 and 2002 were "political" or involved public figures or issues of public controversy. *Id.* at 467 (citing Russell Hickey, *A Compendium of U.S. Criminal Libel Prosecutions: 1990-2002*, Libel Def. Res. Bull., Mar. 27, 2002, at 97). In short, "the use of criminal libel as a bludgeon against unpopular [political] expression continues unchecked," *id.* at 468, and it was ever thus.

## II.  Criminal libel actions in North Carolina have historically been used for the suppression of speech critical of public officials

### A.  Common law criminal defamation prosecutions were historically brought for criticism of public officials

North Carolina's experience with criminal libel prosecutions, while sparse, shows that the action was traditionally used against people who criticized public officials. There were four criminal defamation cases brought in North Carolina from 1663–1730, two of which involved attacks on public officials. Donna J. Spindel, *The Law of Words: Verbal Abuse in North Carolina to 1730*, 39 Am. J. of Legal Hist., 25, 37 (1995). For example, in 1726 a criminal libel case was brought against a colonist who slandered King George, and a 1716 case involved a slander against Justice Worley of the General Court. *Id.* There were 14 additional

14

prosecutions for seditious libel, all of which involved libel against public officials in high places. *Id.*

The prosecution of common law criminal libel in North Carolina continued throughout the nineteenth century and into the beginning of the twentieth century. The only reported cases in that time span involved statements attacking public officials. *State v. Greenville Pub. Co.*, 102 S.E. 318 (N.C. 1920) (prosecution for libeling Pitt County Sheriff); *State v. Townsend*, 86 N.C. 676 (N.C. 1882) (prosecution for libeling prosecutor).

B.   <u>Section 163-274(a)(9) was enacted to quell unpopular political speech</u>

North Carolina enacted the precursor to the current statute, N.C. Gen. Stat. § 163-274(a)(9), in 1913, in circumstances suggesting that it was intended to chill the speech of rivalrous political factions.[1] The 1913 statute, codified in the Consolidated Statutes in 1919, had its origins in North Carolina's Progressive movement of the early 20th.

---

[1] North Carolina has three specific criminal libel statutes. In addition to N.C. Gen. Stat. § 163-274(a)(9), N.C. Gen Stat. § 14-47 (2021) criminalizes the communication of libelous matter to newspapers, and N.C. Gen. Stat. § 53C-8-10 (2021) criminalizes making a false statement about the financial condition of a bank. There are no reported decisions reflecting enforcement of either N.C. Gen Stat. § 14-47 or N.C. Gen. Stat. § 53C-8-10.

*See* Catherine J. Ross, *Ministry of Truth: Why Law Can't Stop Prevarications, Bullshit, and Straight-Out Lies in Political Campaigns*, 16 First Amend. L. Rev. 367, 380 n.75 (2017). In 1912, the progressive faction of the Democratic party had attempted (and failed) to oust the party leader, U.S. Senator F.M. Simmons, in a divisive and bitter primary. Rob Christensen, *The Paradox of Tar Heel Politics* 45–47 (2010). Josephus Daniels, editor of the *News & Observer* and a member of the national Democratic Executive Committee who frequently supported progressive causes, lamented the lavish campaign spending practices that contributed to Simmons' victory over progressive opposition. "[T]here are least a half dozen counties in the State, and maybe more, where the expenses of campaign have become so large as to call for vigorous measures to strangle the corruption before it can be fixed upon our political system." Josephus Daniels, *Must Stop Corruption*, News & Observer, Jan. 26, 1913, at 4.

The 1913 law was introduced by Rep. E.J. Justice of Guilford County, who was described as a "progressive of the Progressives." Josephus Daniels, *Editor in Politics*, *Vol. 2* 618 (1941). It included a range of purported anti-corruption reforms, including financial reporting

16

obligations for candidates, political parties, and non-party interest groups, and the criminalization of derogatory comments made about candidates for office:

> For any person to publish or cause to be circulated derogatory reports with reference to any candidate known by the person publishing or circulating such report to be false, when such report is calculated or intended to affect the chances of such candidate for such office.

C.S. 4185(12) (1919). Given its historical backdrop, the criminal libel statute reads less like a prophylactic against corruption in campaign spending and more like a weapon to be deployed against a political rival.

The 1931 statute, which is based on the 1913 law, was animated by the bitterness of the Democratic campaign in the 1928 presidential election. Democratic Governor Alfred Smith of New York and Republican Herbert Hoover campaigned actively for votes in North Carolina, a state which traditionally backed Democratic candidates. But Governor Smith—an urban, Irish-American Catholic who opposed Prohibition—faced vicious opposition from within his own party in North Carolina, led by F.M. Simmons and a committee of Democrats determined to undermine Smith. Richard L. Watson, *A Political Leader Bolts: F. M. Simmons in the Presidential Election of 1928*, 37 N.C. Hist. Rev. 516, 542 (1960).

17

The "Anti-Smith Democratic Committee" ("Committee") was a "Hoovercrat" organization led by Charlotte Mayor Frank McNinch. *Id.* at 528–29. The Committee circulated anti-Catholic literature about Governor Smith throughout the state and hosted speakers, including the Reverend John Roach Straton, who described the people marching with Governor Smith as the "worse forces of hell in the land" including "the gunmen, the gangsters and the gadabouts; … the gamblers, the horse races and the touts; … the burglars, the pick pockets, and the strong arm men; … the dope fiends, the dive keepers, and the white slavers; and the Sabbath breakers, the scorners, and the God defiers." *Id.* at 531–532.

Senator F.M. Simmons was among the most outspoken Committee members. He gave a three-hour radio speech in which he argued that Governor Smith would upset the South's "satisfactory racial situation" by encouraging legislation "with reference to the 14th Amendment that might be embarrassing." Senator Simmons attacked Governor Smith "as a Wet, parochial in his interest, and inexperienced in international affairs." *Id.* at 534–36. The Committee spent upwards of $30,906—over $600,000 in today's currency—distributing thousands of copies of Senator Simmons' speeches and publishing anti-Smith advertisements. Chairman McNinch refused to file a report of the expenses made by the Committee. *Id.* at 538. The Committee's efforts paid off when Hoover won North Carolina.

Governor Smith's loss in the state led to the promulgation of Section 163-274(a)(9). On February 25, 1931, Democratic State Representative Ewing introduced a bill—which became known as the "Corrupt Practices Act"—to restrict the actions of groups like the Anti-Smith Democratic Committee in future elections. *Ewing Corrupt Practices Act Would Prevent Hoovercrat Expense Account Farce*, News & Observer, Feb. 26, 1931, at 10. Local commentators explained that the bill was introduced "to forever prevent a recurrence of what happened in 1928," noting that it would forestall groups like the Anti-Smith Committee from refusing to file an accounting of expenditures. *Id.*

Among other provisions, the bill included the statute at issue, which criminalizes derogatory speech against candidates for office, like that levied against Smith. The bill closely mimicked the text of the 1913 law, adding the language of "reckless disregard of its truth or falsity" and clarifying that the law applied to candidates in "any primary or election":

> For any person to publish or cause to be circulated derogatory reports with reference to any candidate in any primary or election, knowing such report to be false or in reckless disregard of its truth or falsity, when such report is calculated or intended to affect the chances of such candidate for nomination or election.

N.C. Gen. Stat. § 163-274(a)(9). The bill was enacted in March 1931, after "one-half minute of explanation."

19

Once again, the historical backdrop belies the placement of Section 163-274(a)(9) within a statute purportedly intended to prevent corrupt political practices. The Democratic party—bitter to have lost to F.M. Simmons and his rogue machine within the party—resurrected the 1913 law to ensure that they would have a libel statute to weaponize against their political enemies in the future.

C.    Section 163-274(a)(9) has fallen into desuetude

Thankfully, North Carolina's libel statute is a rare example of its kind[2] and was a dead letter from almost the time of its enactment. In the 90 years since its enactment, only George Pritchard and Attorney General Josh Stein have been targeted under the statute, notwithstanding that that in that time there have been 23 presidential elections, 45 U.S. House elections, 45 U.S. Senate elections, 23 gubernatorial elections, and hundreds of State and local elections for Lieutenant Governor, Attorney General, Council of State, Secretary of State, State Judiciary, Mayors, and City Council Members. These campaigns generated all manner of scurrilous rhetoric but yielded no prosecutions, save one.

---

[2] Only sixteen states have statutes that prohibit false statements about a candidate for public office. David S. Ardia & Evan Ringel, *First Amendment Limits on State Laws Targeting Election Misinformation*, 20 First Amend. L. Rev. 291, 301 & n.39 (2022) (collecting statutes).

There is but one exception over the course of the statute's life. In 1947, the first and only prosecution under N.C. Gen. Stat. § 163-274(a)(9) for publishing derogatory comments about a political candidate was affirmed. *State v. Pritchard*, 41 S.E.2d 287 (N.C. 1947).[3] George E. Pritchard was convicted of "publishing and causing to be circulated" derogatory reports concerning W. I. Halstead, a candidate running for the General Assembly. *Id.* at 168.

This track record speaks to an always dubious statute that has fallen into desuetude. Given that the statute was motivated by political rivalries, and there is only one precedent for criminally prosecuting the criticism of a candidate for office in North Carolina, any criminal action against Attorney General Stein must meet with serious skepticism.

D.    <u>Civil defamation suits provide the proper remedy for libel</u>

Defamation of political candidates in North Carolina did not cease with the enactment of Section 163-274(a)(9). In contrast to the desuetude of that statute, civil defamation suits brought by candidates for office have proceeded apace in North Carolina. *See, e.g.*, *Manley v. Greensboro*

---

[3] In 1947, Section 163-274(a)(9) was codified at N.C. Gen. Stat. § 163-196(11) and is so referenced in the opinion.

21

*News Co.*, 85 S.E.2d 672 (N.C. 1955); *Taylor v. Greensboro News Co.*, 291 S.E.2d 852 (N.C. Ct. App. 1982); *Aycock v. Padgett*, 516 S.E.2d 907 (N.C. Ct. App. 1999); *Grant v. Miller*, 611 S.E.2d 477 (N.C. Ct. App. 2005); *Craven v. Cope*, 656 S.E.2d 729 (N.C. Ct. App. 2008); *Boyce & Isley, PLLC v. Cooper*, 710 S.E.2d 309 (N.C. Ct. App. 2011); *Lewis v. Rapp*, 725 S.E.2d 597 (N.C. Ct. App. 2012). In effect, the citizens of North Carolina have opted for civil suits as the proper remedy for libelous speech, not a defunct criminal statute enacted 90 years ago for questionable reasons.

The clear preference for civil remedies is in step with contemporary First Amendment doctrine. Since 1964, the Supreme Court has affirmed, time and again, that the First Amendment protects harsh, caustic and even hateful speech such as that used by the Anti-Smith Democratic Committee. "[T]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical" of public figures. *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988). Even the most vicious, *ad hominem* criticism based on cultural and religious affiliation is protected: "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394

U.S. 576, 592 (1969); *see, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (protecting language including "God Hates the USA/Thank God for 9/11," "Thank God for Dead Soldiers," and "Don't Pray for the USA"); *see also Falwell*, 485 U.S. at 48, 57 (protecting satirical advertisement in which conservative minister recalls that his first sexual encounter was a drunken rendezvous with his mother in an outhouse).

North Carolina's criminal libel statute violates the First Amendment for many reasons. The historical context of its enactment demonstrates that Section 163-274(a)(9) was inspired by motives that are impermissible under current First Amendment doctrine. At best, this law was an unconstitutional attempt to impose rudimentary civility on political discourse, which is both plainly impermissible and unattainable. At worst, the statute was an attempt to chill the speech of rivals within a party to gain political power—a chilling echo of the English monarch's reliance on criminal libel to stifle his critics, and also impermissible. Finally, the speech that Section 163-274(a)(9) was intended to criminalize—the robust discussion and debate about the qualifications of candidates for elected office—is now recognized as political expression entitled to the highest protections afforded by the First Amendment.

23

North Carolina's criminal libel statute is plainly inconsistent with the First Amendment and should be ruled unconstitutional.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Appellants' brief, this Court should reverse the District Court's denial of the motion for preliminary injunction and rule that Section 163-274(a)(9) is unconstitutional on its face.

/s/ Sarah Ludington
Sarah Ludington, N.C. State Bar No. 19997
C. Amanda Martin, N.C. State Bar No. 21186
DUKE FIRST AMENDMENT CLINIC
210 Science Drive
Durham, NC 27708
Tel: (919) 613-7048
Fax: (919) 613-7262
ludington@law.duke.edu
amartin@law.duke.edu

Christopher A. Brook, N.C. Bar No. 33838
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Tel: (919) 942-5200
Fax: (866) 397-8671
cbrook@pathlaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

       This document contains <u>4,777</u> words.

2.     This document complies with the typeface requirements because:

       This document has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 point Century Schoolbook</u>.

Dated: September 27, 2022

<div style="margin-left:40%">

/s/ Sarah Ludington
Sarah Ludington, N.C. State Bar No. 19997
C. Amanda Martin, N.C. State Bar No. 21186
DUKE FIRST AMENDMENT CLINIC
210 Science Drive
Durham, NC 27708
Tel: (919) 613-7048
Fax: (919) 613-7262
ludington@law.duke.edu
amartin@law.duke.edu

*Counsel for Amicus Curiae*

</div>